[No. B041669. Second Dist., Div. Three. July 31, 1990.]

VICKIE HOWARD, Plaintiff and Appellant, v.
ROBIN DRAPKIN, Defendant and Respondent.

**COUNSEL**

Overland, Berke, Wesley, Gits, Randolph & Levanas and Michael I. Levanas for Plaintiff and Appellant.

Proskauer, Rose, Goetz & Mendelsohn and Steven G. Drapkin for Defendant and Respondent.

Gibson, Dunn & Crutcher, Richard Chernick and Eileen Hale as Amici Curiae on behalf of Defendant and Respondent.

**OPINION**

**CROSKEY, J.**—Plaintiff Vickie Howard (plaintiff) appeals from a dismissal entered after a demurrer to her second amended complaint was sustained without leave to amend. The instant case evolved from a family law matter in which child custody and visitation were in dispute (the underlying action). Defendant Robin Drapkin (defendant), a psychologist, performed an evaluation of plaintiff and her family, and plaintiff now claims that defendant acted improperly in carrying out that task.

In this appeal we are asked to determine whether the alleged wrongful actions of which plaintiff complains were performed in such a context that defendant can claim (1) common law immunity as a quasi-judicial officer participating in the judicial process or (2) statutory privilege under Civil

Code section 47, subdivision 2 (section 47(2))[1] for a publication in a judicial proceeding. We conclude that defendant, acting in the capacity of a neutral third person engaged in efforts to effect a resolution of a family law dispute, is entitled to the protection of quasi-judicial immunity for the conduct of such dispute resolution services. We also find that the litigation privilege provided for in section 47(2) applies to the facts of this case. We therefore affirm the dismissal of plaintiff's complaint.

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises in the context of a family law dispute over custody and visitation rights with respect to the minor son of the plaintiff and her former husband, Robert. The dispute was one of a series and involved charges of physical and sexual abuse. Plaintiff initiated family law proceedings in which she sought to have Robert's custody and visitation rights terminated. Prior to any court hearing, plaintiff and Robert entered into a stipulation which provided that the defendant, as an independent psychologist, would evaluate the facts and circumstances and render nonbinding findings and recommendations. This stipulation was ultimately signed by the court and converted into an order.

Plaintiff's claims against defendant apparently arise from (1) a single six-hour session between plaintiff and defendant, conducted pursuant to the aforesaid stipulation, in which plaintiff alleges that defendant was abusive, (2) defendant's report which plaintiff claims was negligently prepared, included false statements and omitted crucial information and (3) defendant's alleged failure to disclose certain conflicts of interest and lack of expertise in child abuse matters. The pleading before us is plaintiff's second amended complaint in which she had pled causes of action for professional negligence, intentional infliction of emotional distress, negligent infliction of emotional distress and fraud.

In reviewing the sufficiency of the complaint we, of course, accept as true all of the properly pleaded allegations. (*J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799, 803 [157 Cal.Rptr. 407, 598 P.2d 60]; *Buckaloo* v. *Johnson* (1975) 14 Cal.3d 815, 828 [122 Cal.Rptr. 745, 537 P.2d 865]. By her demurrer, defendant admits "all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.]" (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].) Plaintiff's complaint presents the following relevant allegations.

---

[1] Civil Code section 47, subdivision 2 provides in relevant part that with certain exceptions for dissolution of marriage proceedings, "A privileged publication or broadcast is one made— . . . [¶] 2. In any . . . (2) judicial proceeding . . . ."

Defendant is a psychologist licensed by the State of California who was hired in that capacity in early February 1987 by plaintiff and Robert. She was hired to perform a family evaluation of plaintiff, Robert and their nine-year-old child. Such evaluation was necessary because the child had accused Robert of physical, emotional and sexual abuse. Defendant was to evaluate what contact Robert would have with the child, if any.

Because of the decision to retain defendant, plaintiff and Robert agreed to continue an order to show cause hearing which had been scheduled for February 26, 1987. It was further continued from time to time while the evaluation was progressing. The agreement to hire defendant was put into the form of a stipulation and was signed by plaintiff and Robert and by their respective attorneys in the underlying action. (It was entitled "Stipulation and Order for Child Custody Evaluation.") The family law judge had not required the stipulation, did not participate in drafting it and did not supervise defendant's work. Eventually, however, the "order" portion of the stipulation was signed by the court on August 12, 1987, approximately six months after the parties had signed it. Defendant's written report, made after her evaluation was finished, states that her evaluation began March 18, 1987, and ended September 3, 1987.

By the terms of the stipulation, defendant was authorized to provide written reports, but only to plaintiff and to Robert, not to the court. Plaintiff or Robert could call defendant to testify in the custody hearings but the court could not. Defendant was obligated to complete her evaluation, to prepare a written report and to participate in the proceedings or in a deposition only if her fees for such activity were paid in advance.

Plaintiff alleges that her final evaluation meeting with defendant was scheduled for the evening before the order to show cause hearing. Defendant represented to plaintiff that this meeting would only last an hour and a half. It lasted over six hours—from 5:30 p.m. to 11:50 p.m. For five of those six hours, defendant personally attacked plaintiff, screamed at her, ridiculed her, accused her of lying and fabricating evidence, threatened she would lose custody of her son if she persisted in believing his allegations about his father, and misrepresented that the child's doctors and other experts involved in the case did not believe the child had been abused. Plaintiff claims that defendant did this to induce plaintiff to abandon her belief that Robert had abused their child.

With respect to defendant's alleged nondisclosures, plaintiff asserts that defendant (1) failed to divulge her lack of expertise in the area of child and sexual abuse, (2) failed to disclose that she and Robert had a prior professional relationship in that they had spoken and participated together in

professional seminars and (3) failed to disclose that she was a close personal friend of the wife of one of the partners in the law firm which represented Robert in the underlying action.

Plaintiff alleges that in defendant's written report, she neglected to state that a September 1979 hospital examination of the child resulted in the examining doctor (1) finding evidence of " 'irritation of [the child's] scrotum glans [*sic*], penis and shaft of penis' " and (2) stating that " 'It seemed like somebody had been chomping on his penis.' " Besides omitting this and other material information in the written report, plaintiff claims that defendant failed to investigate certain other relevant matters.

Finally, plaintiff asserts that defendant acted with the intent to circumvent the judicial process and to cause plaintiff severe humiliation, mental anguish, and emotional and physical distress. Plaintiff claims that defendant's acts were willful, wanton, malicious and oppressive and she seeks both compensatory and punitive damages.

Defendant filed a general demurrer to the second amended complaint, contending that she has quasi-judicial, quasi-arbitral and/or arbitral immunity as well as immunity as an expert witness. She also claimed entitlement to the "judicial proceeding" or litigation privilege set out in section 47(2). In opposing the demurrer, plaintiff argued that defendant was not a quasi-judicial officer or an arbitrator, having been hired as a private evaluator, and that case law imposes an "interest of justice" limitation upon the section 47(2) privilege which would work in this case to defeat defendant's reliance on such defense. The trial court rejected plaintiff's arguments and sustained the demurrer without leave to amend. An order of dismissal was entered February 28, 1989.

## ISSUE PRESENTED

This appeal raises the issue of the availability of (1) quasi-judicial immunity by reason of defendant's involvement as a neutral dispute-resolving participant in the judicial process and (2) the absolute privilege under the provisions of section 47(2), as a complete bar to plaintiff's actions.

## DISCUSSION

■■ ■ ■ Defendant asserts both of these grounds and we have concluded that both arguments are meritorious.[2] For the historical and

---

[2] We review this case in the context of both quasi-judicial immunity and statutory privilege out of a recognition that they are not coextensive. While on the facts here presented we will

policy reasons discussed below, we believe that absolute quasi-judicial immunity is properly extended to neutral third persons who are engaged in mediation, conciliation, evaluation or similar dispute resolution efforts. As to defendant's second argument, the issue of section 47(2) privilege has, since the filing of the briefs herein, been resolved in defendant's favor by the Supreme Court's decision in *Silberg* v. *Anderson* (1990) 50 Cal.3d 205 [266 Cal.Rptr. 638, 786 P.2d 365].

### 1. *Common Law Immunity*

#### a. *Overview of Judicial Immunity*

■ The concept of judicial immunity is long-standing and absolute, with its roots in English common law. It bars civil actions against judges for acts performed in the exercise of their judicial functions[3] and it applies to all judicial determinations, including those rendered in excess of the judge's jurisdiction, no matter how erroneous or even malicious or corrupt they may be. (*Turpen* v. *Booth* (1880) 56 Cal. 65, 68; *Greene* v. *Zank* (1984) 158 Cal.App.3d 497, 507 [204 Cal.Rptr. 770].) The judge is immune unless "he has acted in the clear absence of all jurisdiction. [Citations.]" (*Greene,*

---

find that they both apply, the statutory privilege extends to bar liability for "communicative acts" but not conduct or "noncommunicative acts." (*Kimmel* v. *Goland* (1990) 51 Cal.3d 202, 211 [ Cal.Rptr. , P.2d ]); *Pacific Gas & Electric Co.* v. *Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1132, fn. 12 [270 Cal.Rptr. 1, 791 P.2d 587].) No such limitation exists for common law quasi-judicial immunity. Here, however, any conduct in which defendant engaged was secondary to and intertwined with the alleged offensive and dishonest communicative acts. Nonetheless, due to the importance of this issue and the likelihood that future cases involving neutral third persons engaged in mediation, conciliation, evaluation or other similar dispute resolution efforts may not be so clear, we believe it necessary to base our decision on both grounds.

[3] "Immunity exists for 'judicial' actions; those relating to a function normally performed by a judge and where the parties understood they were dealing with the judge in his official capacity. [Citations.]" (*Olney* v. *Sacramento County Bar Assn.* (1989) 212 Cal.App.3d 807, 811 [260 Cal.Rptr. 842].) Thus, the line is drawn "between truly judicial acts, for which immunity is appropriate, and acts that simply happen to have been done by judges. Here, as in other contexts, immunity is justified and defined by the functions it protects and serves, not by the person to whom it attaches." (*Forrester* v. *White* (1988) 484 U.S. 219, 227 [98 L.Ed.2d 555, 565, 108 S.Ct. 538].) Acts and decisions which are not judicial or adjudicative, i.e., acts and decisions performed and made by a judge which are administrative or legislative, "even though they may be essential to the very functioning of the courts, have not . . . been regarded as judicial acts." (*Id.* at p. 228 [98 L.Ed.2d at p. 565].)

This does not mean that judges who make legislative or administrative types of decisions are not able to claim legislative immunity (*Supreme Court of Va.* v. *Consumers Union* (1980) 446 U.S. 719, 731 et seq. [64 L.Ed.2d 641, 653 et seq., 100 S.Ct. 1967]; *Forrester* v. *White, supra,* 484 U.S. 219, 228 [98 L.Ed.2d 555, 565-566]) or an immunity like that enjoyed by executive branch officials "when performing within the scope of their power acts which require the exercise of discretion or judgment. [Citations.]" (*Hardy* v. *Vial* (1957) 48 Cal.2d 577, 582 [311 P.2d 494, 66 A.L.R.2d 739]; accord *Forrester* v. *White, supra,* 484 U.S. 219, 230 [98 L.Ed.2d at p. 567]).

*supra,* at p. 507.) Beyond doubt, the doctrine of "civil immunity of the judiciary in the performance of judicial functions is deeply rooted in California law." (*Oppenheimer* v. *Ashburn* (1959) 173 Cal.App.2d 624, 630 [343 P.2d 931]; see also, *Frost* v. *Geernaert* (1988) 200 Cal.App.3d 1104, 1107 [246 Cal.Rptr. 440]; *Tagliavia* v. *County of Los Angeles* (1980) 112 Cal.App.3d 759, 761 [169 Cal.Rptr. 467].)

■ The rationale behind the doctrine is twofold. First, it "protect[s] the finality of judgments [and] discourag[es] inappropriate collateral attacks." (*Forrester* v. *White, supra,* 484 U.S. 219, 225 [98 L.Ed.2d 555, 564].) Second, it "protect[s] judicial independence by insulating judges from vexatious actions prosecuted by disgruntled litigants. [Citation.]" (*Ibid.*) With respect to the latter reason, the immunity is necessary in order to have an independent and impartial judiciary. The public is best served when its judicial officers are free from fear of personal consequences for acts performed in their judicial capacity. (*Greene* v. *Zank, supra,* 158 Cal.App.3d at p. 508.) "If judges were personally liable for erroneous decisions, the resulting avalanche of suits, most of them frivolous but vexatious, would provide powerful incentives for judges to avoid rendering decisions likely to provoke such suits. [Citation.] The resulting timidity would be hard to detect or control, and it would manifestly detract from independent and impartial adjudication." (*Forrester* v. *White, supra,* 484 U.S. 219, 226-227 [98 L.Ed.2d 555, 565].) "It is a judge's duty to decide all cases within his jurisdiction that are brought before him, including controversial cases that arouse the most intense feelings in the litigants. His errors may be corrected on appeal, but he should not have to fear that unsatisfied litigants may hound him with litigation charging malice or corruption. Imposing such a burden on judges would contribute not to principled and fearless decision-making but to intimidation." (*Pierson* v. *Ray* (1967) 386 U.S. 547, 554 [18 L. Ed.2d 288, 294-295, 87 S.Ct. 1213].) " 'The justification for [judicial immunity] is that it is impossible to know whether [a person's claim against an official] is well founded until the case has been tried, and that to submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.' " (*Hardy* v. *Vial, supra,* 48 Cal.2d at pp. 582-583, quoting from *Gregoire* v. *Biddle* (2d Cir. 1949) 177 F.2d 579, 581.) Thus, the protection must be absolute, even to the malicious or corrupt judge. The effect of judicial immunity is that the action against the judicial officer must be dismissed. (*Hardy, supra,* at p. 584.)

b. *Quasi-judicial Immunity*

■ Under the concept of "quasi-judicial immunity," California courts have extended absolute judicial immunity to persons other than judges if

those persons act in a judicial or quasi-judicial capacity. Thus, court commissioners "acting either as a temporary judge or performing subordinate judicial duties ordered by the appointing court" have been granted quasi-judicial immunity. (*Tagliavia* v. *County of Los Angeles, supra,* 112 Cal.App.3d at p. 763.) So also, quasi-judicial immunity from civil suits for acts performed in the exercise of their duties has been given to grand jurors (*Turpen* v. *Booth, supra,* 56 Cal. at p. 69); administrative law hearing officers (*Taylor* v. *Mitzel* (1978) 82 Cal.App.3d 665, 670-671 [147 Cal.Rptr. 323]); arbitrators (*Baar* v. *Tigerman* (1983) 140 Cal.App.3d 979, 985 [211 Cal.Rptr. 426, 41 A.L.R.4th 1004]; *Coopers & Lybrand* v. *Superior Court* (1989) 212 Cal.App.3d 524, 534 [260 Cal.Rptr. 713])[4]; organizations sponsoring an arbitrator (*Olney* v. *Sacramento County Bar Assn., supra,* 212 Cal.App.3d at pp. 814-815); and prosecutors (*Pearson* v. *Reed* (1935) 6 Cal.App.2d 277, 286-288 [44 P.2d 592]). Additionally, the State Bar and the Committee of Bar Examiners, as arms of the Supreme Court, and their officials, as officers of the Supreme Court, have been afforded quasi-judicial immunity from civil suits for acts performed in the exercise of their duties. (*Greene* v. *Zank, supra,* 158 Cal.App.3d at p. 513.) As with the reason for granting judicial immunity, quasi-judicial immunity is given to promote uninhibited and independent decisionmaking. (*Baar* v. *Tigerman, supra,* 140 Cal.App.3d at p. 982.)

As noted above, courts look at the nature of the challenged act which a judge has performed to determine if it is truly judicial and therefore deserving of judicial immunity. So also, in determining whether a person is acting in a quasi-judicial fashion, the courts look at "the nature of the duty performed [to determine] whether it is a judicial act—not the name or classification of the officer who performs it, and many who are properly classified as executive officers are invested with limited judicial powers." (*Pearson* v. *Reed, supra,* 6 Cal.App.2d at pp. 286-287.) In *Pearson,* the court found that a prosecutor, in examining evidence submitted to him and in determining whether to prosecute a case against a defendant, is performing an act that is judicial in nature, thus making him both a quasi-judicial officer and an executive branch officer. (*Ibid.*)

    c.  *The Right to Quasi-judicial Immunity Depends Upon a Connection to the Judicial Process*

    ▮ Plaintiff seeks to establish that California's version of common law judicial and quasi-judicial immunity is applied only to *public officials*

---

[4]The Legislature made judicial immunity for arbitrators a statutory requirement by adding section 1280.1 to the Code of Civil Procedure. (Stats. 1985, ch. 709, § 1, p. 2341.) However, by its own terms, section 1280.1 remains in effect only until January 1, 1991, unless a subsequent statute is enacted to delete or extend that date. (Code Civ. Proc., § 1280.1.)

(judges, grand jurors, prosecutors, commissioners, etc.). ■ ■■■■ If that were so, then arbitrators would not be protected by common law quasi-judicial immunity.[5] ■■ We believe that in California, it is not so much one's status as a public official which has generally been the litmus test for judicial immunity but rather the above-referenced analysis of "functions normally performed by judges." (See fn. 3, *ante*.) It just so happens, that with the exception of arbitrators, and sometimes referees (*Park Plaza Ltd. v. Pietz* (1987) 193 Cal.App.3d 1414, 1418-1419 [239 Cal.Rptr. 51]), such functions have usually been performed by public officials.

The case upon which plaintiff relies for her "public official" analysis is *White v. Towers* (1951) 37 Cal.2d 727 [235 P.2d 209, 28 A.L.R.2d 636], an action for malicious prosecution against an investigator for the State Fish and Game Commission who had the duty of enforcing laws regarding the protection of fish and game. That case does speak of "the immunity from civil liability with which the law surrounds *officials directly connected with the judicial processes.*" (*Id.* at p. 730, italics added.) However, a reading of the court's opinion shows that the court was more interested in the "connected with the judicial process" portion of the above quoted excerpt than with the fact that the defendant could be classified as an "official."

In looking at the doctrine of immunity, the *White* court (*supra*, 37 Cal.2d 727) said at pages 730-732: "The doctrine of immunity from liability for allegedly malicious acts has long been established with respect to numerous public officers. In the early case of *Bradley v. Fisher*, 13 Wall. (U.S.) 335 [20 L.Ed. 646], the doctrine was applied to judges of courts of record . . . . Since that time it has been recognized that the orderly administration of the affairs of government necessitates the inclusion of many officials within the cloak of immunity. Executive heads of administrative departments have been included [citations] as well as their deputies, who act in their stead [citations].

"The last cited cases, however indicative of the trend of judicial decision, do not furnish the persuasive reason for holding that the doctrine extends to peace officers. Rather, it is the line of cases which directly concerns the application of the doctrine *to those connected with the judicial processes* which is determinative herein. Thus, it has been held almost universally that public prosecutors are entitled to immunity. [Citations.] Similarly, grand jurors were early held to be protected against civil actions for alleged malicious prosecution. [Citation.] A review of the cases which have concerned the application of the doctrine to law enforcement officers shows that the great majority of the courts have ruled in favor of the officers."

---

[5] "Arbitration is the submission for determination of a disputed matter to private *unofficial* persons selected in the manner provided by law or by agreement of the parties." (*Stockwell v. Equitable F. & M. Ins. Co.* (1933) 134 Cal.App. 534, 540 [25 P.2d 873], italics added.)

(Italics added.) The *White* court then went on to cite California and federal cases involving law enforcement officers such as a building inspector charged with investigating an alleged violation of a building ordinance, a deputy fire marshal charged with investigating fires, and an assistant city engineer.

Thus, the *White* court focused on the *importance to the judicial system* of persons charged with the duty to investigate crimes and institute criminal proceedings. The court was impressed by their connection to the judicial processes rather than the fact that they could be classified as public officials. In our judgment, that is the proper way to view the matter. We therefore reject plaintiff's efforts to place the emphasis on the status of defendant rather than upon the connection between the defendant's activity and the judicial process.

### d. *Policy Considerations Support the Approach of the Federal Cases to Quasi-judicial Immunity*

For their part, defendant and amicus curiae ask this court to go beyond California's apparently heretofore limited application of the "persons connected with the judicial processes" analysis and apply common law quasi-judicial immunity as the federal courts have applied it—to people connected with the judicial process who are not "public officials," arbitrators or referees, such as (1) mediators, guardians ad litem, therapists, receivers, bankruptcy trustees and other persons appointed by the courts for their expertise and (2) persons whose work product comes into the judicial process to be used by the court even though they were not court-appointed, such as social workers and probation department employees. Defendant and amicus curiae also argue that immunity should be extended even further to a third category of people—those persons involved in alternative methods of dispute resolution, such as mediators and "neutral fact-finders," who function apart from the courts, as did the defendant in the instant case.[6]

Such an extension of quasi-judicial immunity would find persuasive support in a number of federal cases. The federal courts have held that immunity applies to such court-appointed persons as a trust officer employed by the Oregon Department of Veterans Affairs which was acting (by court appointment) as the conservator of plaintiff's estranged husband (*Mosher* v. *Saalfeld* (9th Cir. 1978) 589 F.2d 438, 442, cert. den. 442 U.S. 941 [61 L.Ed.2d 311, 99 S.Ct. 2883]); a receiver appointed by a court to manage

---

[6] We recognize that ultimately defendant's status in the underlying action was governed by a court order. However, in our view, that is not the crucial fact. For several months prior to when the court signed the "order" portion of the "Stipulation and Order for Child Custody Evaluation," the defendant worked pursuant to the private agreement of plaintiff and Robert, albeit in the shadow of pending litigation, in order to effect a resolution of their dispute.

property of a marital estate during a dissolution of the marriage (*New Alaska Development Corp.* v. *Guetschow* (9th Cir. 1989) 869 F.2d 1298, 1302-1303); a child protective services worker acting pursuant to a court order to take a child into custody (*Coverdell* v. *Dept. of Social & Health Services* (9th Cir. 1987) 834 F.2d 758, 764-765); and guardians ad litem, psychologists and attorneys for children in child abuse actions (*Myers* v. *Morris* (8th Cir. 1987) 810 F.2d 1437, 1465-1468, cert. den. 484 U.S. 828 [98 L.Ed.2d 58, 108 S.Ct. 97]).

With respect to nonappointed persons whose work product comes into the judicial process, the courts have held that immunity was properly given to probation officers who prepare presentencing reports for the use by the courts (*Demoran* v. *Witt* (9th Cir. 1986) 781 F.2d 155) and workers at the Michigan Department of Social Services and psychiatrists who were involved in terminating plaintiffs' parental rights (*Kurzawa* v. *Mueller* (6th Cir. 1984) 732 F.2d 1456). The *Kurzawa* court stated that in order to protect the well-being of children, the defendants must be able to perform their jobs "without the worry of intimidation and harassment from dissatisfied parents." (*Id.* at p. 1458; see also, *Alicia T.* v. *County of Los Angeles*, *post*, p. 869 [271 Cal.Rptr. 513], and *Jenkins* v. *County of Orange* (1989) 212 Cal.App.3d 278 [260 Cal.Rptr. 645] [following federal cases which recognize an absolute immunity for 42 U.S.C. § 1983 claims against social workers who were acting within the scope of their employment in investigating allegations of child abuse and initiating dependency proceedings].)

These courts emphasized that the defendants served functions integral to the judicial process (*Demoran* v. *Witt, supra*, 781 F.2d at p. 157; *New Alaska Development Corp.* v. *Guetschow, supra*, 869 F.2d at p. 1303; *Myers* v. *Morris, supra*, 810 F.2d at p. 1467; *Kurzawa* v. *Mueller, supra*, 732 F.2d at p. 1458) and acted as arms of the court (*New Alaska, supra*, at p. 1303, fn. 6; *Demoran, supra*, at p. 157).

For example, in *Myers* v. *Morris, supra*, 810 F.2d at page 1467, the court said: "[T]he . . . therapists, guardians and attorney were appointed to fulfill quasi-judicial responsibilities under court direction. The family court was required to determine whether the children in its custody were neglected and to secure appropriate placements. To perform these functions, the court exercised its statutory authority to seek the assistance of experts. [Citation.] The absolute immunity which is accorded persons acting *as an integral part of the judicial process* protects them from having to litigate the manner in which they performed their delegated functions." (Italics added.)

In *Hardy* v. *Vial, supra*, 48 Cal.2d 577, our Supreme Court recognized that California courts line up with federal decisions in other types of

situations, such as immunity for executive public officers when they are performing nonministerial acts, i.e., when they use their judgment or discretion in performing their jobs. (*Id.* at p. 582.) Also, as defendant points out, many California decisions which address the issue of immunity cite with frequency to federal decisions. (See, e.g., *Hardy* v. *Vial, supra,* 48 Cal.2d 577; *White* v. *Towers, supra,* 37 Cal.2d 727; *Olney* v. *Sacramento County Bar Assn., supra,* 212 Cal.App.3d 807; *Tagliavia* v. *County of Los Angeles, supra,* 112 Cal.App.3d 759; *Taylor* v. *Mitzel, supra,* 82 Cal.App.3d 665.)[7]

We are persuaded that the approach of the federal courts is consistent with the relevant policy considerations of attracting to an overburdened judicial system the independent and impartial services and expertise upon which that system necessarily depends. Thus, we believe it appropriate that these "nonjudicial persons who fulfill quasi-judicial functions intimately related to the judicial process" (*Myers* v. *Morris, supra,* 810 F.2d at pp. 1466-1467) should be given absolute quasi-judicial immunity for damage claims arising from their performance of duties in connection with the judicial process. Without such immunity, such persons will be reluctant to accept court appointments or provide work product for the courts' use. Additionally, the threat of civil liability may affect the manner in which they perform their jobs. (*Moses* v. *Parwatikar* (8th Cir. 1987) 813 F.2d 891, 892, cert. den. 484 U.S. 832 [98 L.Ed.2d 67, 108 S.Ct. 108].)

---

[7] Relying on *Greene* v. *Zank, supra,* 158 Cal.App.3d 497, a civil rights action brought under 42 United States Code section 1983 against the State Bar of California, the Committee of Bar Examiners and their officials, plaintiff argues "that there is a distinct difference between state and federal law in the area of judicial immunity, and that determination of which of the two bodies of law applies depends upon whether the action is a state or a federal one." We disagree with this analysis of *Greene.*

The *Greene* court did hold at page 503 of its opinion that it would necessarily have to apply federal law in that case (i.e., federal law regarding both the elements of a prima facie § 1983 cause of action and the elements of judicial immunity), since the plaintiff's cause of action was based on federal civil rights legislation. However, both federal and California courts look to the act performed by the defendant to determine if it qualifies for judicial (or quasi-judicial) immunity. They examine the act to see if it is " 'a function normally performed by a judge, and to the expectations of the parties, i.e., [so that] they dealt with the judge in his judicial capacity'." If so, it receives judicial immunity. (*Greene* v. *Zank, supra,* 158 Cal.App.3d at page 507, quoting from *Stump* v. *Sparkman* (1978) 435 U.S. 349, 362 [55 L.Ed.2d 331, 342, 98 S.Ct. 1099]; accord *Pearson* v. *Reed, supra,* 6 Cal.App.2d at pp. 286-287 and *Olney* v. *Sacramento County Bar Assn., supra,* 212 Cal.App.3d at p. 811 [neither of which were federal civil rights cases].) In addition, the United States Supreme Court in *Briscoe* v. *LaHue* (1983) 460 U.S. 325 [75 L.Ed.2d 96, 98 S.Ct. 1099] determined that the common law provided absolute immunity from damages liability for persons "who were integral parts of the judicial process" (language similar to that used by our Supreme Court in *White* v. *Towers, supra,* 37 Cal.2d at p. 731) and that section 1983's civil rights provisions did not affect that immunity. (460 U.S. at pp. 335, 329 et seq [75 L.Ed.2d at pp. 107-108, 104 et seq.])

e. *Extension of Immunity to Persons Engaged in Neutral Dispute Resolution Is Appropriate*

In arguing for extensions of immunity to the category of persons who function apart from the courts in an attempt to resolve disputes, defendant and amicus emphasize that in this day of excessively crowded courts and long delays in bringing civil cases to trial, more reliance is being placed by both parties and the courts on alternative methods of dispute resolution. Along traditional lines, the provisions of article VI, section 22 of the California Constitution, which allow the Legislature to provide for the appointment by trial courts of officers such as commissioners, references and masters (*Tagliavia* v. *County of Los Angeles, supra*, 112 Cal.App.3d at p. 763), are becoming ever more important. We have court commissioners (Code Civ. Proc., § 259) and voluntary and mandatory referees (Code Civ. Proc., § 638 et seq.). In addition, contracts for binding arbitration (Code Civ. Proc., § 1280 et seq.) and provisions for nonbinding arbitration (Code Civ. Proc., § 1141.10 et seq.) help relieve court congestion. So also does Civil Code section 4607's provision for mandatory mediation of child custody and visitation disputes.

More recently, other aspects of alternative dispute resolution efforts are being used with greater frequency. There are voluntary settlement conferences which are conducted by volunteers working with the court through, for example, local bar associations. In addition, if it is necessary, the parties can choose a mediator or neutral fact finder with the expertise to facilitate a resolution of their particular dispute. As amicus notes, mediation is traditionally a nonbinding dispute resolution alternative. While most mediation is voluntary, some is compulsory, like that provided for in Civil Code section 4607.[8]

Besides relieving court congestion and speeding up the conclusion of cases, these less-traditional alternative dispute resolution procedures are often less expensive and less stressful than seeing a case through its normal trial path. Like the more formal dispute resolution procedures, they are critical to the proper functioning of our increasingly congested trial courts.

We agree with defendant and amicus that the justification for giving judicial and quasi-judicial immunity to judges, commissioners, referees,

[8] In the instant case, plaintiff states in her opening brief that defendant was hired by herself and the child's father to provide psychological services in an attempt to resolve the family's problems outside of court, (as well as to prepare a report and potentially act as an expert witness if called by either parent). Thus, in addition to the mandatory mediation which plaintiff and her husband would receive under Civil Code section 4607, they were receiving private *mediation-type* services from defendant.

court-appointed persons (such as psychologists, guardians ad litem and receivers), and nonappointed persons (such as those who prepare probation reports and handle child abuse cases) applies with equal force to these neutral persons who attempt to resolve disputes. Although they are not "law connected," as are judges, commissioners and court-appointed experts, neither are nonjudicial arbitrators. (*Stockwell* v. *Equitable F. & M. Ins. Co., supra*, 134 Cal.App. at p. 540.) Similarly, referees, although appointed by the courts, may or may not be employees or officers of the court and they may be paid by the parties. (*Park Plaza, Ltd.* v. *Pietz, supra*, 193 Cal.App.3d at p. 1419.)[9]

Plaintiff notes that attorneys can be held liable to their clients for professional negligence because they have a specific duty to their clients. Using a "duty to the public" vs. "duty to a client" approach, plaintiff seeks to distinguish the federal "court appointment" cases from the instant case. She argues that "It is, among other things, the absence of a public responsibility, and the presence of a duty to private clients, which distinguishes the instant case from the various authorities defendant cited . . . for the proposition that court-appointed mental health professionals are immune from civil liability . . . . In each of the cases relied upon by the defendant, the psychologist or psychiatrist was either acting as an agent of the court pursuant to a court appointment in order to provide an opinion to the court itself [citations] or was a government official who owed a direct duty to the public at large [citations] or was appointed by the court and had the responsibility of reporting to a governmental agency [citation]."

However, in reviewing the issue of immunity, we think that the focus is more correctly placed on a nonadvocate vs. advocate analysis. Thus, while the criminal defense attorney who is paid with public funds has a duty to the public not to waste those funds, it is his or her job as an *advocate* for the defendant which makes him or her responsible and liable to the defendant and susceptible to a later civil action.

In contrast, the psychologist who is mediating a child custody dispute, whether by court appointment or not, is not an advocate for either parent, even if paid by them. (Cf. *Park Plaza, Ltd.* v. *Pietz, supra*, 193 Cal.App.3d at p. 1419, where the court said that referees who are paid for by the parties

---

[9] In *Coopers & Lybrand* v. *Superior Court, supra*, 212 Cal.App.3d 524 this court discussed the 1985 legislation which had expanded immunity for arbitrators. We recognized that "The law . . . has come a long way from disfavoring arbitration so as not to encroach on the jurisdiction of the courts to the present policy of actively encouraging alternative dispute resolution in order to relieve the burden on the judicial system." (*Id.* at p. 535.) In the instant opinion, we recognize the necessity for immunity for other but similar alternative dispute resolution activities.

in a law suit are not employees or independent contractors of those parties or of their attorneys.) The job of third parties such as mediators, conciliators and evaluators involves impartiality and neutrality, as does that of a judge, commissioner or referee; hence, there should be entitlement to the same immunity given others who function as neutrals in an attempt to resolve disputes. In a sense, those persons are similar to a judge who is handling a voluntary or mandatory settlement conference, no matter whether they are (1) making binding decisions (such as referees acting pursuant to Code Civ. Proc., § 638, subd. (1), and arbitrators), (2) making recommendations to the court (such as referees acting under Code Civ. Proc., § 639 or mediators acting under Civ. Code, § 4607), or (3) privately attempting to settle disputes, such as the defendant here.

■ We therefore hold that absolute quasi-judicial immunity is properly extended to these neutral third parties for their conduct in performing dispute resolution services which are connected to the judicial process and involve either (1) the making of binding decisions, (2) the making of findings or recommendations to the court or (3) the arbitration, mediation, conciliation, evaluation or other similar resolution of pending disputes. As the defendant was clearly engaged in this latter activity, she is entitled to the protection of such quasi-judicial immunity.

### 2. *Statutory Privilege*

■ The second ground for demurrer raised by defendant is based on the provisions of section 47(2). A recent decision of the Supreme Court (*Silberg* v. *Anderson, supra*, 50 Cal.3d 205) mandates that in spite of the nature of the behavior which plaintiff's allegations attribute to defendant, the defendant is protected from the tort liability claimed by plaintiff.

### a. *Background of the Silberg Case*

As in the instant case, the complaint in *Silberg* stemmed from an underlying dissolution of marriage action and its attendant custody and visitation issues. In that underlying action, the husband (who was later to be the plaintiff in the *Silberg* case) asked his attorney to obtain an agreement from his wife that all family members would submit to an evaluation and counseling by an independent psychologist for the purpose of determining appropriate custody and visitation orders for their children. Wife's attorney (the defendant in the *Silberg* case) recommended a psychologist (Robert Adler) who was ultimately selected by plaintiff and his wife.

After an "apparently adverse" result for the plaintiff, plaintiff sued his wife's attorney, contending that contrary to defendant's representations, the

psychologist was not independent and neutral because he had had a preexisting and undisclosed relationship with defendant. Plaintiff claimed that defendant used her influence with Dr. Adler to his wife's advantage in the evaluation of the family members and that due to defendant's influence, Adler produced a biased and inaccurate report. Husband sued the defendant-attorney for breach of contract, negligence and "intentional tort," which the Supreme Court said was apparently intentional infliction of emotional distress but might also be fraud.

The defendant-attorney generally demurred to the complaint, contending that section 47(2) made her statements during the family law matter privileged. The trial court sustained the demurrer without leave to amend and dismissed the action. The Court of Appeal reversed as to the cause of action for "intentional tort" and remanded the case, directing the trial court to allow the husband to amend that cause of action. The court concluded that section 47(2) did not apply if defendant's representations were made to obtain personal objectives or to gain an advantage for her client through deceit. The court held that in such a case, the statements could not have been made to promote the "interest of justice" and further held that such a determination was one for the trier of fact.

The Supreme Court granted review to consider the question of whether the privilege set out in section 47(2) is subject to the "interest of justice" exception which some previous Court of Appeal decisions had recognized.

b.   *The Supreme Court's Silberg Analysis*

(1)   *The Nature of the Section 47(2) Privilege*

In discussing the privilege given by section 47(2), the *Silberg* court noted that (1) the privilege has been given application "to any communication, whether or not it amounts to a publication"; (2) it applies to *all* torts except malicious prosecution; (3) "it applies to any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved"; and (4) it applies "to *all* publications, irrespective of their maliciousness." (*Silberg* v. *Anderson, supra*, 50 Cal.3d at pp. 212, 216.)

In setting out the "test" for application of the section 47(2) privilege, the *Silberg* court stated: "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have [*sic*] some connection or

logical relation to the action. [Citations.]" (*Silberg* v. *Anderson, supra*, 50 Cal.3d at p. 212.)

With respect to the third element, the court stated: "The requirement that the communication be in furtherance of the objects of the litigation is, in essence, simply part of the requirement that the communication be connected with, or have some logical relation to, the action, i.e., that it not be extraneous to the action. A good example of an application of the principle is found in the cases holding that a statement made in a judicial proceeding is not privileged unless it has some reasonable relevancy to the subject matter of the action. [Citations.] The 'furtherance' requirement was never intended as a test of a participant's motives, morals, ethics or intent. [Citations.]" (*Silberg* v. *Anderson, supra*, 50 Cal.3d at pp. 219-220.)

### (2) The "Interest of Justice" Factor

The court addressed the above-mentioned line of Court of Appeal cases which had carved out an exception to the section 47(2) privilege. The exception was applied to communications which had not been made for the purpose of promoting the interest of justice. The court stated that the decision in which this test originated (*Bradley* v. *Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818, 826 [106 Cal.Rptr. 718]) took the third element of the test for application of section 47(2) (i.e., that the communication have been made to achieve the objects of the litigation) and read into it the additional requirement that the communication must have also been made for the purpose of promoting the "interest of justice." (*Silberg* v. *Anderson, supra*, 50 Cal.3d at p. 217.)

The *Silberg* court rejected the "interest of justice" requirement, saying that endorsement of such a requirement "would be tantamount to the exclusion of *all* tortious publications from the privilege, because tortious conduct is invariably inimical to the 'interest of justice.'" (*Silberg* v. *Anderson, supra*, 50 Cal.3d at p. 218.) The court stated that even though well-intentioned, the interest of justice requirement "is wholly inconsistent with the numerous cases in which fraudulent communications or perjured testimony have nevertheless been held privileged. [Citations.]" (*Ibid.*)[10]

---

[10] One of the cases cited by the *Silberg* court was *Carden* v. *Getzoff* (1987) 190 Cal.App.3d 907 [235 Cal.Rptr. 698], a case from this division. In that case (which also stemmed from a dissolution of marriage matter), the plaintiff sued his former wife's accountant-witness, alleging that the accountant falsified a report which he had prepared and then used that report to give perjured testimony at trial.

The accountant had prepared, on behalf of the wife, a medical practice valuation of the husband's anesthesiology practice, in order to determine the value of its goodwill. The accountant stated he compared husband's practice to the goodwill of three similar practices he had also examined. In his complaint against the accountant, the husband alleged that the

### c. *Application of Silberg's Four-part Test*

In her opening brief, plaintiff summarizes defendant's conduct as "failing to disclose her previous connections with one of the parties [i.e., an implied representation by defendant that she was acting in a professional manner by being independent], screaming at and otherwise psychologically abusing [plaintiff], negligently or deliberately misstating the facts she had learned about the case, negligently or deliberately failing to include in her report crucial facts which corroborated [the child's] complaints, and directly threatening [plaintiff] with the loss of custody of her son if [plaintiff] told anyone about defendant's acts of misconduct." All of the causes of action in plaintiff's second amended complaint allege tortious conduct. Thus, the four-part test for section 47(2) immunity which is set out in *Silberg* is applicable to each. (*Silberg* v. *Anderson, supra,* 50 Cal.3d at p. 212.)

Plaintiff apparently concedes, as she must, the existence here of the second and the fourth elements of the section 47(2) test, i.e., that the communications were made by a participant in the litigation and that the publications have some connection or logical relation to the case. Defendant was an invited, and ultimately court-approved, participant in the dissolution matter and her communications were obviously related to a portion of the issues in the dissolution action—custody and visitation.

Although it seems that plaintiff should also concede the existence of the first element (that the defendant's alleged wrongful communications were made in a judicial or quasi-judicial proceeding), plaintiff argues in her reply brief that defendant's communications were "collateral" because they were not made during the course of and as a part of the judicial proceeding. That contention has no merit. The court in *Silberg* stated that the section 47(2) privilege applies "even though the publication is made outside the courtroom and no function of the court or its officers is involved." (*Silberg* v. *Anderson, supra,* 50 Cal.3d at p. 212.)

As for the third element, i.e., that the communication be made to achieve the objects of the litigation, we find that this element is clearly met. Defendant's alleged wrongful communications (whether express or implied and

accountant (1) had made no valuation of his practice, (2) had made no such comparison because the three alleged anesthesiologists did not even exist in the State of California and (3) should have concluded that husband's practice had no goodwill value because he worked on staff as part of a rotation group at a hospital and had no patients of his own.

The husband sued the accountant for abuse of process, intentional infliction of emotional distress and negligent infliction of emotional distress. This court held that section 47(2) immunized the accountant from liability. We stated that the defendant's "publications" in both his written report and his testimony at trial were privileged. *Carden* was cited several times by the *Silberg* court. (*Silberg* v. *Anderson, supra,* 50 Cal.3d at pp. 215, 216, 218.)

whether screamed or simply stated) were "not . . . extraneous to the action" but rather had a "logical relation" to it. (*Silberg* v. *Anderson, supra,* 50 Cal.3d at pp. 219-220.) Defendant's acts were part of a process undertaken by the husband and wife to aid the court in its decision on an important matter in the dissolution. Defendant's "motives, morals, ethics or intent" are not in issue when asking whether her acts were in furtherance of the objects of the dissolution proceedings. (*Id.* at pp. 219-220.) Thus, we conclude that section 47(2)'s privilege serves to protect defendant from her alleged wrongful conduct.

### CONCLUSION

On the facts of this case, the defendant was entitled to common law immunity and statutory privilege. Thus, the trial court was correct in sustaining defendant's demurrer without leave to amend.

▮▮▮ The absolute immunity and privilege to which defendant is entitled must protect her from suit. Such doctrines are not mere defenses to liability. (*Mitchell* v. *Forsyth* (1985) 472 U.S. 511, 525-526 [86 L.Ed.2d 411, 424-425, 105 S.Ct. 2806]; *Hardy* v. *Vial, supra,* 48 Cal.2d at p. 584; *Silberg* v. *Anderson, supra,* 50 Cal.3d at p. 220.) If such protection is to be meaningful it must be effective to prevent suits such as this one from going beyond demurrer. Avoiding the expense and burden of having to defend an action such as this one is precisely the goal which the principles of absolute immunity and privilege were intended to achieve. In order to best protect the ability of neutral third parties to aggressively mediate or resolve disputes, a dismissal at the very earliest stage of the proceedings is critical to the proper functioning and continued availability of these services.

### DISPOSITION

The order of dismissal is affirmed. Costs on appeal to defendant.

Klein, P. J., concurred.

**DANIELSON, J.,** Concurring and Dissenting.—I concur in the result reached in the foregoing decision, but emphatically dissent and disassociate myself from the reasoning and the holding of the majority opinion which would create, by judicial legislation, a "quasi-judicial immunity" in persons whom it vaguely designates as "neutral third party participants in the judicial process."

In the first place, the majority simply designates those upon whom it would confer this newly created quasi-judicial immunity as "neutral," and

thereafter assumes that they are, in fact, neutral. Whether or not they are truly neutral presents a very substantial question of fact, one which would not have to be decided if this appeal were decided under existing law. The litigation privilege of Civil Code section 47, subdivision 2 (hereafter section 47(2)) provides a broad privilege which will protect participants in litigation from the consequences of their communications. Thus, the immunity which the majority would create serves no recognizable useful purpose.

### The Majority's Holding Is Judicial Legislation

The majority frankly and honestly acknowledges that defendant has asked this court to "go beyond" California's heretofore limited application of immunity and apply it to others (1) appointed by courts for their expertise, and (2) persons whose work product comes into the judicial process to be used by the court, even though they were not court appointed, such as social workers. The majority has granted that request. The majority holds "that absolute quasi-judicial immunity is properly extended to neutral third party participants in the judicial process." But who is doing the extending? The answer is: This court. However, the majority does not identify, nor can they, their constitutional authority for "going beyond" the Constitution and the laws of the State of California, and "extending" immunity to such third parties. By that act of "extending" they have created a new immunity, a new exemption from accountability, which has not existed in the laws of this state. To borrow the words of our Supreme Court in *Mutual Life Ins. Co.* v. *City of Los Angeles* (1990) 50 Cal.3d 402, 416 [267 Cal.Rptr. 589, 787 P.2d 996], this is "nothing more than judicial legislation."

The People of California, in establishing our Constitution, wisely followed the example of the United States and separated governmental powers into three branches. It is well that we remember and honor that fact. The legislative power remains "vested in the California Legislature" (art. IV, § 1); the executive power remains "vested in the Governor"; (art. V, § 1); and the judicial power is "vested in the [Courts]." (Art. VI, § 1.) Our courts do not have jurisdiction to legislate and have no right either to create new causes of action or to abolish those which are already established. Those are legislative functions. (*Modern Barber Col.* v. *Cal. Emp. Stab. Com.* (1948) 31 Cal.2d 720, 726-727 [192 P.2d 916].)

### The Majority's Holding Is Gratuitous

The majority's creation of a new quasi-judicial immunity is wholly gratuitous. In deciding the central issue presented by this appeal the court could have, and should have, decided it on the basis of existing law. The litigation privilege of section 47(2) disposes of that issue fully, completely, and

quickly; and that disposition is based upon law when it was enacted by the people through their Legislature more than 100 years ago and which has been refined and interpreted many times by our courts. The majority did, in fact, utilize section 47(2) as an alternate basis for its decision, after first utilizing 18 pages of its opinion in its effort to justify and to create its new quasi-judicial immunity. The disposition under section 47(2) is correct and, standing alone, fully supports the result reached. This new judicial legislation is redundant and unnecessary.

*Judicial Immunity Is Very Limited in Scope*

The majority opinion presents an extensive overview of judicial immunity. In studying that overview it must be noted and then remembered that judicial immunity, even for judges, is limited to those judicial acts which are adjudicatory in nature, i.e., decisionmaking, dispositive, and the immunity does not otherwise extend to acts which simply happen to be done by judges. It is the *function* of adjudication of an issue, the decisionmaking function, which requires and is the basis for judicial immunity. The decision of the United States Supreme Court in *Forrester* v. *White* (1988) 484 U.S. 219 [98 L.Ed.2d 555, 108 S.Ct. 538], is controlling on that point; and it provides no basis for extending such immunity to the nonadjudicatory actions of judges, nor of their adjuncts. A fortiori, judicial immunity should not extend to persons who are neither judges nor their adjuncts, but only third party participants in litigation, i.e., witnesses.

It is important that this limitation be kept in mind, since the effect of the majority opinion is to extend judicial immunity, termed "quasi-judicial immunity," to persons who do not adjudicate but who are, at most, "neutral third-party participants in the judicial process."

The majority's scholarly review of judicial immunity contains no valid argument to justify extending such immunity to nonjudicial persons who do not perform an adjudicatory function.

*The Majority's Reasoning Does Not Support Its Holding*

The majority discourses at length on their perceived need for creating their new quasi-judicial immunity. The examples they cite as demonstrating a need for such immunity do not support their conclusion. Where immunity is granted to the categories of persons which they mention, that immunity is based upon the function such person is performing at the particular time, not on his or her calling or profession. As pointed out, above, judicial immunity extends to the person exercising a judicial function which is adjudicatory, decisionmaking, in nature. Even the act of a judge, in the

performance of his duties as a judge, which is not adjudicatory in nature, is not clothed with judicial immunity. (*Forrester* v. *White, supra,* 484 U.S. 219.) The many categories of professionals referred to by the majority are granted immunity for their acts as adjuncts to a judge in aid of the judge's performing an adjudicatory act; they are the extension, so to speak, of the judge in those circumstances.

*The Creation of Immunity Is a Legislative Function*

When it is necessary, or desirable, as a matter of public policy to extend judicial immunity to persons who would otherwise probably not enjoy it the Legislature has the power and the right to do so. Thus the Legislature has extended such immunity to arbitrators when acting in the capacity of arbitrators. The Legislature also has the constitutional power to provide for the appointment of persons other than judges to perform some judicial duties.

"The Legislature may provide for the appointment by trial courts of record of officers such as commissioners to perform subordinate judicial duties." (Cal. Const., art. VI, § 22.)

In 1985 the Legislature granted judicial immunity to arbitrators by enacting Code of Civil Procedure section 1280.1, which provides, in part: "An arbitrator has the immunity of a judicial officer from civil liability when acting in the capacity of arbitrator under any statute or contract." If there had been any need to extend judicial immunity to those encompassed in the new immunity created by the majority opinion the Legislature could have met that need by similar legislation at that time, or if such need now exists the Legislature is the correct branch of government, and has the power and the right to do so now.

Profound changes in our laws, such as the majority seek to make, should be forged in the proven and legitimate crucible of the legislative process. There witnesses can be heard, pro and con the issue, and they are subject to questioning and probing, under the scrutiny of the press, which tests the interests of the witnesses as well as the merit and need for the proposed legislation. Debate and vote in two houses of the Legislature, and the requirement of approval by the Governor, also assure careful evaluation of the proposals. That is the procedure called for by our Constitution, and it is far better than legislation created in the relative secrecy of a judicial chamber.

The majority's discussion in support of its holding that judicial immunity should be extended to some broad, undefined, class is actually a series of arguments which might be used to support proposed legislation to create

such an immunity. The reasoning might make a good law review article, but it has no place in a judicial decision. Laws should be created by legislation, not by litigation.

*The Litigation Privilege of Section 47(2) Does Not Create an Immunity*

We must remember that Civil Code section 47(2), creates a privilege for certain publications and broadcasts, commonly referred to as communications. The privilege is known as the "litigation privilege" and is absolute in tort actions, except for malicious prosecution suits. (*Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 214-217 [266 Cal.Rptr. 638, 786 P.2d 365].) However, section 47(2) does not confer immunity on any person or class of persons, it is limited to reaching and conferring a privilege on certain communications.

As pertinent to this discussion, section 47(2) provides, in part: "A privileged publication . . . is one made—

". . . . . . . . . . . . . . . . . . .

"2. In any (1) legislative or (2) judicial proceeding, or (3) in any other official proceeding authorized by law . . . ."

CONCLUSION

The process of litigation is a search for truth and justice. To the extent we limit the power of the courts to reach out in search of evidence, in search of the truth, and to the extent we deny citizens the right to seek redress for their grievances, we limit and impair the judicial process. Courts, and legislatures, should be most careful before they absolve persons of accountability for their conduct.

The litigation privilege of section 47(2) is quite enough to provide all persons connected with litigation with protection from tort liability for their communications. There is no need, and there is no showing that it would be wise, to clothe them with an immunity greater than that afforded to judges.